**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 2:05-CR-29 |
| | : | |
| GRANT TOUZEL, | : | |
| Defendant. | : | |
| | : | |

**OPINION AND ORDER**

Defendant Grant Touzel is charged with conspiracy to
manufacture methamphetamine and possession of approximately 700
pounds of ephedrine.  He moves to suppress evidence seized by the
Vermont State Police and various statements that he made to law
enforcement officers.  For the reasons set forth below, the
motion to suppress (Doc. 19) is DENIED.

**I. FACTUAL BACKGROUND**

The following facts are taken from the video recording taken
from the camera in Senior Trooper Michael LaCourse's police
cruiser on February 8, 2005, and from the testimony elicited at
the hearings held in this Court on August 17, 2005, September 1,
2005, and January 5, 2006.

**A. Touzel's Encounter with Trooper LaCourse**

The instant motion concerns events that began on the icy
winter evening of February 8, 2005, in the remote town of
Ferdinand, Vermont, approximately 20 miles south of the Canadian
border.  Senior Trooper LaCourse and Trooper Mullin of the

Vermont State Police were directing traffic at the scene of a motor vehicle accident on Vermont Route 105.  The road was iced over from freezing rain and blocked by power lines that had been downed by the accident.  Tpr. LaCourse had parked his cruiser diagonally across the highway to stop traffic and to prevent motorists from driving through the downed lines.  Tpr. Mullin, a rookie trooper still in his field training period, was some distance away on the other side of the accident.

Upon this scene came Grant Touzel, driving west on Route 105 in a white 1992 Chevrolet cargo van with a Quebec license plate.  Touzel drove up to Tpr. LaCourse, who signaled him to stop and advised him of the accident.  Tpr. LaCourse asked Touzel where he was headed, and he responded that he was going to North Stratford, New Hampshire.  Tpr. LaCourse was confused by Touzel's answer, because North Stratford was approximately ten miles east of the accident scene, and Touzel was heading west, away from North Stratford.  He then asked where Touzel had come *from*, and Touzel answered "North Stratford" again.  Tpr. LaCourse asked why he was going there, and Touzel responded that he was going to get a motel room.  Tpr. LaCourse was again confused, because he was not aware of any motels or hotels in the small village of North Stratford.  He inquired after Touzel's final destination, and Touzel stated that it was Burlington, Vermont.

Tpr. LaCourse then began questioning Touzel about the purpose of his trip.  Touzel responded that he was a courier and

2

that he was carrying printed materials for a company that had
moved.  He stated that he had picked up the materials at the
Happy Corner Cafe, which he assumed to be in a place called Happy
Corner.  Tpr. LaCourse was not aware of a restaurant by that name
in the area, nor was he aware of a town or village called Happy
Corner.[1]  He asked Touzel whom he had met to pick up the
materials, and Touzel answered that he had met a man by the name
of Serge, but that he did not know Serge's last name.

Tpr. LaCourse then asked whether Touzel was carrying any
shipping documents.  Touzel handed over a single sheet of white
paper containing two typewritten addresses, one in Swanton,
Vermont, and one in City of Industry, California.  Tpr. LaCourse
felt that the document was not typical of commercial shipping
papers, because it did not identify the goods being shipped, the
owner of the goods, or the name of the carrier, and it did not
contain any spaces for signatures.  He also found it peculiar
that the only Vermont address was in Swanton, while Touzel had
advised him that his destination was Burlington, which is
approximately 35 miles south of Swanton.

**B. <u>The initial search of Touzel's van</u>**

Because Touzel's responses to his questions had aroused Tpr.

---

[1] It was later established that there was an establishment known
as the Happy Corner Cafe in Pittsburg, New Hampshire,
approximately 45 minutes east of the accident scene.  There is no
town or village of Happy Corner.

LaCourse's suspicions, Tpr. LaCourse asked whether Touzel would mind opening the back of his van to verify that he was actually carrying printed materials and that nobody else was in the van with him.  Touzel responded that he did not mind, and the two of them walked to the back of the van, where Touzel opened the rear doors.  Using his flashlight, Tpr. LaCourse saw numerous document boxes inside the van.  The boxes were in a dilapidated condition, and many were held together with duct tape or shipping tape. Tpr. LaCourse noticed one box with a six- to eight-inch tear, and through the tear he could see a clear plastic bag holding a white granular substance.  His initial suspicion was that the box held cocaine.  He pulled a corner of the bag through the hole and showed it to Touzel.  Touzel stated, "Shit, that's not what they told me it was."  Tr. of Hearing of Aug. 17, 2005 at 28 (hereinafter 8/17 Tr.), Ex. to Supp. Mem. to Mot. to Suppress (Doc. 35).

**C.  <u>Touzel's handcuffing and detention by Tpr. LaCourse</u>**

After discovering the white substance, Tpr. LaCourse placed Touzel in handcuffs but advised him that he was not under arrest. He stated that he was going to "place you in handcuffs for a minute, for your safety and mine until I figure out what's going on here."  Tr. of Tpr. LaCourse's Vehicle Videotape at 2 (hereinafter Video Tr.).  Shortly thereafter, he told Touzel that "you're not under arrest or anything, but [the handcuffs are] just for your safety and mine until I find out exactly what's

going on here, OK sir?"  Id.  Touzel indicated that he understood
by responding "sure." Id. at 3.

Touzel remained handcuffed for approximately 25 minutes.  On
at least one occasion during Touzel's detention, additional
motorists arrived at the scene.  Tpr. LaCourse inquired as to
where they were going and gave them directions to reach their
destinations by alternate routes.  Id. at 4-7.  Tpr. LaCourse
also communicated by radio to request other officers to come to
the scene and to coordinate with power company personnel about
the downed power lines.

 During that time, the only conversation between Tpr.
LaCourse and Touzel concerned whether Touzel would consent to a
further search of his van.  Touzel asked what the benefit of
consenting would be, and Tpr. LaCourse responded that he believed
he had probable cause to obtain a warrant and explained why he
believed this.  He told Touzel that the process would be over
much more quickly if Touzel gave consent.  Touzel indicated that
he understood the situation and that he would consent to the
additional search.

Shortly before 9:00 pm, Tpr. LaCourse patted Touzel down for
weapons and, finding none, allowed his handcuffs to be removed.
Touzel then signed a written form consenting to a search of his
van.  At that point, Tpr. LaCourse retrieved Touzel's jacket and
cigarettes from his car and gave them to him.

After the handcuffs were removed, Tpr. LaCourse asked Touzel a series of questions about his activities that day.  In response to the questioning, Touzel discussed again how he had picked up the boxes from a man named Serge and stated that he was in the business of being a courier.  He stated that Serge had contacted him by telephone and directed him to pick up the boxes.  Tpr. LaCourse asked what Serge had told him was in the boxes, and Touzel replied, "I don't want to get in any more shit than I already am."  Id. at 20.  He expressed concern that his safety might be threatened by the individuals who owned the material in the boxes.  See id. at 20-21.  He also made statements implying that he considered it likely that the contents were illegal.  See id. at 29 ("[Y]ou had the same impression I did as soon as I saw it."); id. at 30 ("I presume it is [illegal].").

Between 9:30 and 10:00 pm, additional officers arrived, including Agent Perry of the Border Patrol and Trooper Smith of the Vermont State Police.  Tpr. Smith had brought a field testing kit for cocaine, and he tested the white substance, but it did not test positive for cocaine.  At approximately 11:00 pm, Agent Gilson of the Border Patrol arrived with a drug detection dog.  The dog adopted an "alert" posture both outside and inside the van, indicating that it had detected a controlled substance.  Shortly thereafter, Touzel was advised that he was being placed under arrest and that his van would be seized.  Tpr. Mullin then transported Touzel to the Derby barracks of the State Police.

Touzel's van was subsequently searched pursuant to his written consent.  The search uncovered approximately 700 pounds of the white substance.  That substance was ultimately identified by the Vermont State Police Laboratory as epherdrine, a listed chemical as defined in Title 21, U.S. Code, Section 802. Ephedrine is a major ingredient in the production of methamphetamine, a Schedule II controlled substance.

D. **Touzel's interviews with law enforcement officers**

Early the next morning, at approximately 2:30 AM on February 9, Detective David Robillard of the Vermont State Police questioned Touzel at the Derby barracks.  Detective Sergeant Matt Nally was present for a portion of the interview as well.

Det. Robillard testified that he read Touzel his rights under Miranda v. Arizona, 384 U.S. 436 (1966); that Touzel indicated that he understood his rights and that he wished to speak anyway; and that Touzel signed a written Miranda waiver form.  Tr. of Hearing of Sept. 1, 2005 at 10-11 (hereinafter 9/1 Tr.), Ex. to Doc. 35.  The questioning session lasted approximately one hour, and Det. Robillard testified that Touzel did not request to speak with an attorney during that time.  Id. at 14.  Det. Nally testified that he did not hear Touzel mention an attorney during the time that he was in the room.  Det. Robillard testified that he was not aware whether Touzel had slept that night, but he did state that Touzel appeared to be alert and competent at the time that he signed the waiver.

7

Although the Derby barracks contained recording equipment, Det. Robillard did not make an audio or video recording of the interview.

Later that morning, Det. Robillard and Det. Nally transported Touzel from Derby to the United States courthouse in Burlington.  Det. Robillard testified that Touzel asked on one occasion if there would be legal representation when he arrived. Id. at 15.  Det. Nally, who was on the phone with other law enforcement officials during portions of the drive, testified that he did not recall hearing Touzel mention an attorney.

It is unclear whether Touzel made any other mention of an attorney during the drive.  One of the officers with whom Det. Nally spoke during the trip was Lieutenant Glenn Hall of the Vermont Drug Task Force.  Lt. Hall, in turn, spoke several times that morning to Special Agent Thomas Doud of the United States Drug Enforcement Administration.  Agent Doud subsequently wrote in a report filed on February 11, 2005 that "[w]hile Touzel was being transported, Lt. Hall reported to S/A Doud that any post arrest cooperation by Touzel had become stalled because he Touzel [sic] had expressed a desire to talk to an attorney."  Report of Agent Doud at 5, Ex. 1 to Doc. 19.

Lt. Hall testified, however, that he did not recall making any mention to Doud about Touzel having requested an attorney, much less that cooperation had become stalled.  Moreover, at the

8

September 1 hearing, Agent Doud was less certain about what Lt.
Hall had told him.  He testified:

> My recollection is that it was clearly not an invocation
> for an attorney, not a request for an attorney, but that
> Lieutenant Hall stated it in such a way that it made me
> want to try and clarify with Mr. Touzel here at the
> courthouse exactly what he had said and whether he was
> invoking or not.  My recollection is that Lieutenant Hall
> said either he's talking about wanting to talk to an
> attorney or he's sort of wanting to talk – or he's sort of
> talking about wanting to talk to an attorney, but in my
> mind it was vague, and it was during the transport.

9/1 Tr. at 60-61.

Upon arriving at the courthouse in Burlington, Touzel was
brought to an interview room, where he met with Agent Doud.
Agent Doud had been informed prior to meeting with Touzel that an
attorney was on her way.  Id. at 85.  Before the attorney
arrived, Agent Doud began interviewing Touzel.  He did not ask
whether Touzel had previously requested an attorney.  Instead, he
made the determination that Touzel was confused about the
situation, and he decided to "start from scratch" and advise
Touzel of his Miranda rights again.  Id. at 68.  Touzel indicated
that he understood his rights, and that he was willing to answer
certain questions, but not all questions, before talking to an
attorney.

Agent Doud proceeded to ask Touzel various questions
regarding the possibility of eliciting his cooperation in the
ongoing matter.  Touzel answered certain questions and refused to
answer others, saying that he wanted to wait to answer until he

9

talked to an attorney.  After approximately 15 or 20 minutes, Agent Doud terminated the interview.  Touzel's court-appointed attorney, Barbara O'Connor, did not arrive until Agent Doud was leaving.

Ms. O'Connor subsequently made it clear that Touzel was not willing to cooperate in the case.  On February 24, 2005, Touzel was indicted on one count of conspiring to manufacture methamphetamine and one count of possession of ephedrine.  The instant motion to suppress followed.

## II. DISCUSSION

Touzel argues that the events of February 8-9 gave rise to four separate violations of his rights, and that each violation entitles him to suppression of various evidence.  First, he argues that Tpr. LaCourse committed an unreasonable seizure by stopping and questioning Touzel upon his arrival at the accident scene.  Second, he argues that Tpr. LaCourse's initial search of the van was unlawful because it exceeded the scope of Touzel's consent.  Third, he argues that Tpr. LaCourse should have advised him of his Miranda rights upon placing him in handcuffs after discovery of the white substance.  Finally, he argues that he was improperly interrogated by Det. Robillard, Det. Nally, and Agent Doud without having waived his right to counsel and after specifically invoking that right.

## A. Validity of Trooper LaCourse's stop and questioning of Touzel

Touzel argues that Tpr. LaCourse's initial stop and

questioning at the accident scene constituted an unreasonable seizure in violation of the Fourth Amendment.  He contends that since Tpr. LaCourse had no reason to suspect that Touzel was acting in violation of the law, it was improper to detain him.

1. The initial stop

Touzel correctly notes that "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes 'seizure' of 'persons'" for purposes of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809 (1996).  For this reason, the Constitution requires that any automobile stop be reasonable under the circumstances.  Id. at 810.  When the purpose of a stop is to investigate potential traffic or criminal violations, the test of reasonableness is whether the police officer has "probable cause to believe that a traffic violation has occurred." Id.; see also Delaware v. Prouse, 440 U.S. 648, 663 (1979) (requiring an "articulable and reasonable suspicion" that the motorist's vehicle or an occupant is "subject to seizure for violation of law").

However, "[e]ncounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime." Terry v. Ohio, 392 U.S. 1, 13 (1968).  Thus, police officers often act in a "community caretaking" capacity, fulfilling a public safety role that is "totally divorced from the detection, investigation, or

11

acquisition of evidence relating to the violation of a criminal statute." Cady v. Dombrowski, 413 U.S. 433, 441 (1973).  When an intrusion on privacy is a valid exercise of the community caretaking function, it may be reasonable even if the officer has no probable cause to suspect a violation.  Id. at 447-48.

Management of traffic at the scene of a motor vehicle accident falls within an officer's community caretaking function. United States v. King, 990 F.2d 1552, 1560-61 (10th Cir. 1993). Accordingly, temporary detention of a driver is reasonable within the meaning of the Fourth Amendment if it is necessary to protect public safety.  See id. at 1561 (holding that an officer at an accident scene "was justified in approaching Defendants' car and could have briefly detained Defendants in order to inform King of the hazardous conditions and to advise him to cease honking, regardless of whether King's actions violated any traffic laws").

In this case, Tpr. LaCourse's decision to stop Touzel's car, warn him of the accident, and direct him to turn around was unquestionably a valid exercise of the community caretaking function.  Because the road ahead of Touzel was icy and blocked by downed power lines, Tpr. LaCourse's action was necessary for Touzel's safety and for that of others on the road.

Tpr. LaCourse's inquiries into Touzel's route and destination were also within the scope of the community caretaking function.  Because the accident had closed a major highway, it was reasonable for Tpr. LaCourse to offer motorists

12

assistance regarding alternate routes.  On a dark, icy night,
such assistance might well be necessary not only for motorists'
convenience, but also their safety.  The fact that Tpr. LaCourse
inquired after at least one other motorist's destination and
offered assistance with directions reinforces the conclusion that
Tpr. LaCourse's initial interaction with Touzel was an exercise
of community caretaking.

   2. <u>Trooper LaCourse's subsequent questioning of Touzel</u>

     Touzel argues that even if the initial stop and destination
inquiry was justified under a community caretaking rationale,
Tpr. LaCourse exceeded the scope of his community caretaking
function by engaging in more detailed questioning about the
purpose of Touzel's trip and the nature of his cargo and by
asking to look in the back of his van.

     Touzel is correct, and the government does not dispute, that
the more detailed questioning went beyond the scope of community
caretaking.  The government argues, however, that because
Touzel's confusing answers to Tpr. LaCourse's initial inquiries
about his route gave rise to a reasonable and articulable
suspicion, Tpr. LaCourse was justified in continuing the
detention.

     "After a traffic stop that was justified at its inception,
an officer who develops a reasonable, articulable suspicion of
criminal activity may expand the scope of an inquiry beyond the
reason for the stop and detain the vehicle and its occupants for

13

further investigation." United States v. Givan, 320 F.3d 452,
458 (3d Cir. 2003); accord United States v. Sparks, 2004 U.S.
Dist. LEXIS 2278, *15 (S.D.N.Y. Feb. 13, 2004).  In determining
whether an officer had reasonable suspicion to justify an
investigatory stop or detention, courts look to the "totality of
the circumstances." United States v. Sokolow, 490 U.S. 1, 8
(1989); United States v. Bayless, 201 F.3d 116, 133 (2d Cir.
2000).  The court must view the situation "through the eyes of a
reasonable and cautious police officer on the scene, guided by
his experience and training." Bayless, 201 F.3d at 133.

Applying those standards, the Court concludes that Tpr.
LaCourse had a reasonable and articulable suspicion that Touzel
was engaged in criminal activity.  Tpr. LaCourse was a trained
law enforcement officer who had been posted for at least five
years at the Derby barracks of the State Police, near the
Canadian border.  8/17 Tr. at 21.  In that position, he was
familiar with and experienced at recognizing various types of
cross-border criminal activity, such as alien smuggling and drug
trafficking.  When Touzel arrived in a cargo van and gave
implausible and conflicting answers about where he was coming
from and where he was going, it was reasonable for Tpr. LaCourse
to suspect that Touzel might be engaged in one of these
activities and to ask additional clarifying questions.  See
United States v. Pulliam, 265 F.3d 736, 740 (8th Cir. 2001)
(holding that "[c]ontradictory statements establish the

14

reasonable suspicion necessary to detain a motorist further and to interview passengers").

Moreover, Touzel's responses to Tpr. LaCourse's subsequent questions, far from dispelling Tpr. LaCourse's suspicions, only deepened them. Touzel claimed that he was working as a commercial courier, but did not know which company he was moving goods for; he was unaware of the individuals he was working with, except for a man known only as "Serge"; he was unable to identify the town where he had picked up the goods; the only shipping documents he possessed failed to identify the carrier, the cargo, or the sender; and he claimed he was going to Burlington, but his documents listed addresses in Swanton and California. Taken as a whole, these answers reinforced Tpr. LaCourse's suspicion that Touzel was involved in illegal activity, and this suspicion formed a reasonable basis for the continued detention and questioning.

For these reasons, Tpr. LaCourse did not violate Touzel's Fourth Amendment rights by stopping Touzel's car, engaging him in conversation about his travel plans, and following up with additional questioning when Touzel's answers aroused suspicion. Accordingly, there is no basis for suppression of the evidence and statements obtained as a result of those actions.

**B. Whether Trooper LaCourse's initial search of Touzel's vehicle exceeded the scope of Touzel's consent**

Touzel next seeks to suppress the evidence discovered during the initial search of his van.  He argues that Tpr. LaCourse exceeded the scope of consent that Touzel had given to inspect the cargo area.  He contends that Tpr. LaCourse should have restricted his inspection to looking through the back windows of the van, and that it was inappropriate to open the back doors, physically enter the van, open the boxes, or pull out the contents.

By consenting to a search, an individual waives the protections afforded by the usual requirements of a warrant and probable cause.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  A search conducted pursuant to voluntary consent cannot exceed the bounds of the actual consent, however.  United States v. Taibe, 446 F. Supp. 1142, 1147 (E.D.N.Y. 1978), aff'd, 591 F.2d 1333 (2d Cir. 1978).  The scope of the consent is defined by what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect."  Florida v. Jimeno, 500 U.S. 248, 251 (1991).

Tpr. LaCourse testified that he "asked Mr. Touzel if he would mind opening the back of his van to verify what he was shipping was actually printed materials, and that nobody else was in the van with him."  8/17 Tr. at 24.  He further testified that Touzel responded "sure," stepped out of his van readily, and

16

walked to the back of the van.  Id.  He stated that Touzel opened the back doors of the van, although he did not recall whether Touzel did so on his own or in response to a request by Tpr. LaCourse.  Id. at 81.

Tpr. LaCourse's testimony establishes that Touzel authorized him to search in order to accomplish two goals: to determine whether Touzel's cargo was actually printed material, and to establish whether there were any other occupants in the van. Tpr. LaCourse's actions did not exceed the scope of this consent. He explicitly asked Touzel whether "he would mind opening the back of his van," so Touzel's suggestion that Tpr. LaCourse should have restricted his search to peering through the back window is without merit.[2]

Furthermore, a reasonable person in Touzel's position would have understood that in order to verify the nature of the cargo, it would be necessary for Tpr. LaCourse to enter the van, shine his flashlight at the boxes, and investigate contents that were visible through ripped areas of those boxes.  It is immaterial whether Touzel gave explicit permission to pull the plastic bag out of the box.  The white powder was already in plain view, and even if it had not been, Touzel had impliedly consented to

---

[2] Moreover, Tpr. LaCourse testified that the back windows of the van were difficult to see through because they were "covered with road dirt, salt, road scum."  8/17 Tr. at 81.  Hence, even if he had not specifically asked Touzel to open the doors, it would have been reasonable for Touzel to expect that Tpr. LaCourse would need to do so to fulfill the goals of his search.

17

further investigation of the boxes by authorizing Tpr. LaCourse to verify that he was carrying printed material.

Touzel's reliance on <u>United States v. Elliott</u>, 107 F.3d 810 (10th Cir. 1997), is misplaced.  In that case, a police officer had asked to look into a car's trunk, but he had assured the driver that he did not "want to look through each item." <u>Elliott</u>, 107 F.3d at 815.  The court, finding that this assurance had limited the scope of the officer's search, held that evidence that he had discovered by unzipping a closed container must be suppressed.  <u>Id.</u>  In this case, by contrast, Tpr. LaCourse did not give any assurances that he would restrict his search to a cursory visual sweep.  Instead, he made clear that his goal was to establish whether Touzel was carrying printed material, and his actions fell within the scope of that goal.

For these reasons, Touzel's request for suppression of the results of the first search of his van must be denied.

## C. **Whether Touzel was entitled to *Miranda* warnings upon being handcuffed**

Touzel argues that once he was placed in handcuffs, Tpr. LaCourse was obligated to inform him of his rights under <u>Miranda v. Arizona</u>.  Under <u>Miranda</u>, a police officer may not interrogate a suspect who has been taken "into custody" without first warning him "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot

18

afford an attorney one will be appointed for him prior to any questioning if he so desires." <u>Miranda</u>, 384 U.S. at 479.  If no such warning is given, the prosecution may not use statements obtained during the interrogation in its case in chief.  <u>United States v. Newton</u>, 369 F.3d 659, 668 (2d Cir. 2004).  Noting that Tpr. LaCourse never advised him of his <u>Miranda</u> rights at any time during the evening, <u>see</u> 8/17 Tr. at 87, Touzel seeks to suppress all statements he made after being handcuffed.

Touzel will only have been entitled to <u>Miranda</u>'s protections, however, if Tpr. LaCourse placed him in custody.  In the Second Circuit, the test for determining whether a person is in custody for <u>Miranda</u> purposes is "whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest."  <u>Id.</u> at 671.  Two important factors in making that determination are whether "a reasonable person in the suspect's shoes would have understood that his detention was not likely to be temporary and brief," and whether he "would feel that he was completely at the mercy of the police."  <u>Id.</u> at 675 (citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 437, 438 (1984)).

In arguing that he was in custody, Touzel relies primarily on the fact that he was placed in handcuffs.  It is true that the presence of handcuffs is an important factor in the determination of whether a person is in custody.  <u>See</u> <u>Newton</u>, 369 F.3d at 675 (noting that "[h]andcuffs are generally recognized as a hallmark

19

of a formal arrest."). However, handcuffs do not automatically transform a detention into a custodial interrogation. See, e.g., United States v. Cota, 953 F.2d 753, 758-59 (2d Cir. 1992); United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995); United States v. Bautista, 684 F.2d 1286, 1291-92 (9th Cir. 1982). Instead, courts consider "all the circumstances presented" to determine whether the standard has been met. Newton, 369 F.3d at 677.

Considering the totality of the circumstances in this case, the Court cannot accept Touzel's contention that he was in custody during or after the period in which he was in handcuffs. Not only was the actual period of handcuffing relatively brief, but Tpr. LaCourse explicitly notified Touzel that it was a temporary measure, stating that he intended to "place you in handcuffs for a minute . . . until I figure out what's going on here." Video Tr. at 2. He also informed Touzel that "if [the contents of the boxes are] nothing illegal, then there's no reason you can't be on your way." Id. at 11. Having received these assurances, Touzel cannot persuasively argue that someone in his position would reasonably have believed that his detention would not be temporary and brief or that he was completely at the mercy of the police.

Tpr. LaCourse also made clear that he was using the handcuffs for safety reasons and that Touzel was not under arrest. Although such a disclosure carries less weight when a

subject is handcuffed than when he is unrestrained, it is still a relevant factor in determining whether "a reasonable person would understand any restraints on his freedom to be to be comparable to those associated with a formal arrest." Newton, 369 F.3d at 676.  In this case, Tpr. LaCourse made the purpose of the handcuffs abundantly clear.  He stated twice that he was using the handcuffs "for your safety and mine" and that he was only doing it "until I figure out what's going on here."  Video Tr. at 2.  He also stated at the outset that "you're not under arrest or anything," and invited a response from Touzel by asking, "OK, sir?"  Id.  Touzel responded "sure," indicating that he understood the purpose of the detention.  Id. at 3.  Tpr. LaCourse reminded Touzel that he was not under arrest on at least two more occasions, id. at 11, 20, and Touzel again responded, "sure, sure," id. at 20.

     The surrounding circumstances reinforced Tpr. LaCourse's explanation that he was handcuffing Touzel for safety reasons. Tpr. LaCourse was the only police officer at the scene with Touzel; his partner, Tpr. Mullin, was out of reach on the other side of the accident.  He was in a remote location on a rural highway, many miles from the nearest town.  In addition, Tpr. LaCourse was called upon to attend to numerous duties at once. In addition to investigating the situation with Touzel, he was directing traffic to prevent additional accidents from occurring, coordinating with power company officials, and communicating with

other law enforcement officers.  Given this chaotic situation, it would have been reasonable for Touzel to expect that Tpr. LaCourse would need to place him in handcuffs to ensure everyone's safety.

Touzel argues that this case is governed by the Second Circuit's holding in United States v. Newton, in which the defendant was held to have been in custody while he was handcuffed.  In that case, Newton was confronted and handcuffed in his apartment by six law enforcement officers, who advised him that he was not under arrest.  They proceeded to interrogate him about whether he had any "contraband" in the apartment; when he admitted to having a gun, they questioned him further about it. Newton, 369 F.3d at 663-64.  On appeal, the Second Circuit held that Newton had been in custody during the interrogation, although it upheld his conviction on the ground that the questioning fell within Miranda's "public safety" exception.  Id. at 677, 679.

While there are some similarities between this case and Newton, the essential facts are markedly different.  Tpr. LaCourse was a single officer in a remote location with many competing duties; as such, the safety rationale for the handcuffing was considerably more apparent than in Newton, where there were six officers with full control of the situation.  In addition, Tpr. LaCourse explained repeatedly to Touzel that he was not under arrest and that he was being handcuffed for safety

22

reasons, and Touzel indicated his understanding of this on more than one occasion.  By contrast, Newton received such notice only once, and there is no indication that he signaled that he understood.  Finally, unlike Newton, Touzel was not interrogated during the period he was in handcuffs; the only conversation between Touzel and Tpr. LaCourse concerned Tpr. LaCourse's efforts to gain consent for a search of the van.

In the Court's view, the instant case is more comparable to United States v. Cota than to Newton.  In Cota, the Second Circuit held that the fact that officers had initially used guns and handcuffs during a stop of the defendant had not rendered the defendant in custody for purposes of subsequent questioning.  As the court noted, "[n]ot only was the initial use of guns and handcuffs necessitated by the officers' safety concerns, but the handcuffs were removed as soon as the car was examined and the perceived security threat abated."  Cota, 953 F.2d at 759.  Just as in Cota, Touzel was handcuffed for a brief period for safety reasons, he was not subjected to intensive questioning during that time, and the handcuffs were removed once the situation was under control.

For these reasons, Tpr. LaCourse's handcuffing of Touzel did not place him in custody within the meaning of Miranda, and he is not entitled to suppression of the statements that he made subsequent to being handcuffed.

**D. Whether Touzel was unlawfully deprived of his right to counsel**

Touzel argues that his right to counsel was violated following his arrival at the Derby barracks.  He contends that the government has not met its burden of establishing that he waived his right to counsel prior to questioning by Det. Robillard and Det. Nally.  He also contends that regardless of whether he initially waived the right to counsel, he subsequently invoked that right by making statements indicating a desire for an attorney.  Accordingly, he seeks to suppress all statements that he made to Det. Robillard and Det. Nally in Derby and to Agent Doud in Burlington.

1. <u>Touzel's waiver of counsel before Detective Robillard</u>

The burden is on the government to demonstrate an intentional waiver of the right to counsel.  <u>Brewer v. Williams</u>, 430 U.S. 387, 404 (1977).  Touzel argues that it has failed to meet that burden.  He notes that Det. Robillard failed to make an audio or video recording of the interview at the Derby barracks during which Touzel is said to have waived his rights.  He also notes that when the interview began, some time after 3:00 AM, he had been in police custody since approximately 8:20 the previous evening, and that Det. Robillard testified that he was unaware as to whether Touzel had gotten any sleep that night.  Finally, he notes that Det. Robillard denied Touzel's requests to smoke a cigarette until after the interrogation was completed.  Taken

24

together, he suggests, these facts cast doubt on whether he actually made an intentional waiver of his right to counsel.

Notwithstanding Touzel's observations, the Court is satisfied that the government has met its burden.  Det. Robillard testified that he read Touzel his rights, that Touzel indicated that he understood his rights and that he wished to speak anyway, and that he signed a written waiver form.  The waiver itself introduced into evidence at the hearing.  See Ex. 5 to Mot. to Supp. (Doc. 19).  Accordingly, there is ample evidence of a waiver even though the interview was not recorded.  In addition, while it is not clear from the record how much, if at all, Touzel had slept that night, and while it is true that he was not allowed to smoke during the interview, Det. Robillard testified that Touzel appeared to be alert and competent at the time that he signed the waiver.  For these reasons, the Court concludes that Touzel intentionally waived his right to counsel at the outset of the Derby barracks interview.

2. <u>Whether Touzel invoked his right to counsel</u>

Touzel also argues that whether or not he made a valid waiver, he subsequently invoked his right to counsel by indicating that he wanted an attorney.  When an individual in custody requests counsel, "the interrogation must cease until an attorney is present."  <u>Miranda</u>, 384 U.S. at 474; <u>Edwards v. Arizona</u>, 415 U.S. 477, 482 (1981).  An individual may invoke the right to counsel even after previously having waived it.

25

<u>Miranda</u>, 384 U.S. at 444-45.  However, a request for counsel is ineffective unless it is unambiguous.  <u>Davis v. United States</u>, 512 U.S. 452, 459-60 (1994).  "If a suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."  <u>Id.</u> at 462.

Touzel contends that he made various statements indicating his desire for an attorney during the interview with Det. Robillard and Det. Nally at the Derby barracks.  <u>See</u> Mot. to Supp. at 17.  However, both Det. Robillard and Det. Nally testified that they never heard Touzel mention an attorney during that interview, and Touzel has not presented any evidence to the contrary.  Accordingly, the Court finds that Touzel did not invoke his right to counsel during the Derby barracks interview.

Touzel also contends that he requested an attorney during the drive from Derby to Burlington.  He relies primarily on the passage in Agent Doud's report that "any post arrest cooperation by Touzel had become stalled because . . . Touzel had expressed a desire to talk to an attorney."  Agent Doud's third-hand account, however, is contradicted by the testimony of the individuals who were actually present with Touzel at the time of the purported invocation of counsel.  Det. Nally testified that he never heard Touzel request a lawyer, and Det. Robillard testified that Touzel's only mention of a lawyer was to ask if there would be legal representation in Burlington when he arrived.  Moreover, Lt. Hall, who spoke directly with Det. Nally, also testified that

26

he was not aware of any invocation of counsel by Touzel.  Given this unequivocal testimony by the individuals who were closest to the scene of the purported request for counsel, the Court is forced to conclude that Agent Doud must have suffered from a misunderstanding or a failure of recollection when he wrote two days later that Touzel had requested a lawyer.

Because Agent Doud's report provides insufficient evidence of an invocation of counsel, the only available evidence is that Touzel asked Det. Robillard if there would be legal representation in Burlington.  Such a question fails to qualify as an unambiguous request for counsel.  See, e.g., United States v. Doe, 170 F.3d 1162, 1166 (9th Cir. 1999) (holding that a suspect's question, "What time will I see a lawyer?" was not an unambiguous invocation of the right to counsel, but rather an "inquiry regarding the time at which appointed counsel would be made available"); Diaz v. Senkowski, 76 F.3d 61, 64 (2d Cir. 1996) (holding that the question, "Do you think I need a lawyer?" was not a reasonably clear invocation of the right to counsel).

For these reasons, Touzel cannot be deemed to have made a valid invocation of his right to counsel while at the Derby barracks or while being transported to Burlington, and hence he is not entitled to suppression of any statements on that basis.

## CONCLUSION

For the foregoing reasons, Touzel's motion to suppress is DENIED.

27

Dated at Burlington, Vermont this 9th day of January, 2006.


                                    /s/ William K. Sessions III
                                    William K. Sessions III
                                    Chief Judge